**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTINE KOUGHER,** | : | **CIVIL ACTION NO. 1:04-CV-2209** |
| **TRACY MILLER, KEYSTONE** | : | |
| **GOLDEN RETRIEVER RESCUE,** | : | **(Judge Conner)** |
| **INC.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **RICK BURD, MARY BENDER,** | : | |
| **NATHAN MYER and ANGIE H.** | : | |
| **HOLLOWAY,** | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

This is a § 1983 action filed by Tracy Miller ("Miller") and Christine Kougher

("Kougher").  Miller is a state dog warden employed by the Bureau of Dog Law

Protection ("Bureau") under the auspices of the Pennsylvania Department of

Agriculture.  Kougher is President of Keystone Golden Retriever Rescue, Inc.

("Rescue"), also a party plaintiff.  The defendants are Rick Burd ("Burd"), Mary

Bender ("Bender"), Nathan Myer ("Myer") and Angie H. Holloway ("Holloway").

Burd is the Executive Director of the Bureau and Bender is the Bureau's Director

of Enforcement.  Myer is a commercial kennel owner and serves as a member of the

Dog Law Advisory Board.  <u>See</u> 3 PA. STAT. ANN. § 459-901(c).[1]  Holloway is a private

citizen and former unlicensed kennel owner who was the subject of certain dog law

enforcement proceedings.

---

[1]For ease of reference, the court will occasionally refer to Burd, Bender and
Myer collectively as "the State Defendants".

In their complaint, plaintiffs allege that defendants violated their First Amendment Rights to free speech and association.  Specifically, Kougher and Rescue allege that their "freedom to associate and speak out for purposes of protecting the health and well-being of dogs and the rights of dog owners are being unlawfully oppressed" by the State Defendants.  (Doc. 1 ¶ 1.)  Miller "contends that he has been unlawfully punished, threatened, and intimidated because he has spoken out for and pursued his lawful duties to enforce and uphold the law."  Id. Presently before the court is a motion for summary judgment filed by the State Defendants.  For the reasons that follow, the motion will be granted.

## I.   Factual Background and Procedural History

### A.   Local Rules of the Middle District of Pennsylvania

When deciding summary judgment motions, the court derives the relevant undisputed facts from the parties' statements submitted pursuant to Local Rule 56.1.  This rule instructs the parties to file

> . . . a separate short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.  The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the [moving party's statement], as to which it is contended that there exists a genuine issue to be tried.  Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.  All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless

2

controverted by the statement required to be served by the
opposing party.

L.R. 56.1.  Local Rule 56.1 provides parties with precise parameters for the

presentation of summary judgment issues.  In the instant case, the court has

scrutinized the parties' Rule 56.1 statements and record references[2] and gleaned the

following facts from those paragraphs which, except as otherwise noted, are either

admitted by the plaintiffs or are uncontroverted by the plaintiffs' record citations.[3]

**B.** **Relevant Facts**

1. Bureau Duties

The Bureau is responsible for enforcing the Dog Law, 3 PA. STAT. ANN.

§§ 459-101 to 459-1205, the Rabies Prevention and Control in Domestic Animals and

Wildlife Act, 3 Pa. Stat. Ann. §§ 455.1 to 455.12, as well as Department regulations

promulgated under the statutes.  (S.F. ¶ 12.)  In general, these responsibilities

include the licensing and control of dogs, kennel licensing and inspections, dog bite

investigations, funding of certain county and humane organizations to establish dog

---

[2]As part of its review, the court has examined each of the parties' fifty-nine
(59) exhibits comprising the summary judgment record.  (See Docs. 26, 36 and 46.)

[3]Plaintiffs' counterstatement of material facts fails to provide adequate record
support for certain disputed material facts.  (See, e.g., Doc. 31 ¶ 12 (citing to
forms/applications for the proposition that dog wardens are *required* to enforce
sections of the Crimes Code that fall within the scope of their employment)); see
also infra note 7.  Accordingly, the facts set forth herein reflect the court's analysis
of the parties' Rule 56.1 statements and all applicable record references.  In this
memorandum, the court will use the abbreviation "S.F." to refer collectively to the
parties' Rule 56.1 statements. (See Docs. 24, 31.)

control facilities, and the enforcement of dog and kennel owner obligations. (S.F. ¶ 13.)[4]

Material to the instant matter is the Bureau's position that the Dog Law does not provide dog wardens with authority to issue citations under the Pennsylvania Crimes Code, Title 18 of the Pennsylvania Consolidated Statutes. (Doc. 24 ¶ 19.) The plaintiffs dispute this position, relying, in part, on an opinion dated July 27, 1983 of a former chief counsel of the Department of Agriculture. (Doc. 31 ¶ 19; Doc. 36, Ex. W.) Plaintiffs assert that the defendants "selectively" interpreted the Dog Law in violation of the plaintiffs' constitutional rights, observing, by way of example, that Miller had previously written numerous citations for cruelty to animals under 18 PA. CONS. STAT. ANN. § 5511(a)(2). (Doc. 31 ¶ 19; Doc. 32 at 4.)

2.    Miller's Animal Cruelty Charges Against Holloway

In June 2003, Holloway contacted Rescue seeking to place three golden retrievers—two adults and a puppy. Rescue agreed to accept Holloway's dogs. (Doc. 36, Ex. I at 3.) The dogs arrived at Rescue with a variety of maladies. A veterinary examination revealed worms, coccidia and malnourishment. Id.

---

[4]The court notes in passing that the Governor of Pennsylvania recently appointed a distinguished member of our bar, Jessie L. Smith, Esquire, to the newly created position of Special Deputy Secretary of Dog Law Enforcement. Press Release, Pennsylvania Department of Agriculture, Governor Rendell Acts to Strengthen State Dog Law (Oct. 17, 2006), http://www.agriculture.state.pa.us/ agriculture/cwp/view.asp?A=390&Q=141949. In addition, the Governor proposed "sweeping changes" to the Dog Law and related state regulations and appointed a new Dog Law Advisory Board. Id. These changes are "designed to improve the conditions under which dogs are bred and sold in Pennsylvania." Id.

Thereafter, Kougher contacted Miller, Burd, Bender and various state officials, seeking an investigation of Holloway's kennel operation based upon the poor condition of Holloway's dogs.  Id. at 4.[5]

In October 2003, Holloway received a directive from the Department of Agriculture to apply for a kennel license.  (Doc. 36, Ex. J at 5.)  The directive advised that if Holloway failed to apply for a kennel license, the Department would initiate an injunction proceeding to shut down her kennel operations.  Id.  In November 2003, Bender, Burd, Miller and a state veterinarian conducted an inspection of Holloway's kennel.  Id.  The inspectors discovered 131 dogs living in unsanitary conditions.  Id.  Consequently, Miller filed, *inter alia*, animal cruelty charges against Holloway pursuant to 18 PA. CONS. STAT. ANN. § 5511.  Id.  Shortly thereafter, Bender directed Miller to withdraw all Criminal Code citations based upon the Department's position that dog wardens lack the requisite authority for the unilateral prosecution of such charges.  Id.; (S.F. ¶¶ 20-21.)

In December 2003, Bender issued a comprehensive memorandum to all state dog wardens to clarify the Bureau's official policy that dog wardens do not possess the authority to file charges under the Pennsylvania Crimes Code.  (Doc. 26, Ex. G at 2-3.)  It provides, in pertinent part, as follows:

---

[5]Miller was familiar with Holloway's operation.  Miller had previously inspected Holloway's kennel and cited her for various violations of the Dog Law, including operating an unlicensed kennel and possessing unlicensed dogs.  (Doc. 36, Ex. J at 2-4.)

The Dog Law defines the term "police officer" to include State Dog Wardens.  However, definitions in [a] statute define terms as they relate to that statute only, and do not alone give Wardens any power or authority outside the legal boundaries of the Dog Law.  The Dog Law provides the authority to issue summary citations and enter onto the premises of any person for the purposes of investigation.  In addition, although section 401(b) of the Dog Law states, "State dog wardens and employees of the Department are considered to be police officers when enforcing any of the provisions of this act or regulations pursuant to this act," it does not specifically provide for arrest powers.  **It is therefore the policy of the Department that wardens do not possess arrest powers. Wardens have the authority to enforce the provisions of the Dog Law and Rabies Law only.**

* * *

With regard to the question concerning whether wardens have the authority to issue citations or bring charges related to cruelty to animals, it the opinion of the Department's Office of Chief Counsel that **no such authority exists within the Dog Law, or Section 5511 of the Crimes Code (related to cruelty to animals).**  This position has been communicated repeatedly, both verbally and in writing, to Wardens in the past.  Simply stated, the Dog Law does not address cruelty charges. The authority with regard to cruelty to animals is established under Section 5511 of the Crimes Code. Section 5511(I) states "An agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of the Commonwealth, shall have the same powers to initiate criminal proceeding[s] provided for police officers by the Pennsylvania Rules of Criminal Procedure."  The Pennsylvania Rules of Criminal Procedure define a "Police Officer" as ". . . any person who is by law given the power to arrest when acting in the scope of the person's employment."  The Pennsylvania Rules of Criminal Procedure also define "Law Enforcement Officer" as ". . . any person who is by law given the power to enforce the law when acting within the scope of that person's employment."  As stated

6

above, a warden has the power to enforce the Dog Law, but does not have arrest powers under the Dog Law; therefore, **wardens are not police officers as defined by the Pennsylvania Rules of Criminal Procedure, and have no statutory authority to file cruelty to animal charges.**

Based on this legal opinion, **any cruelty charges that have been filed by any warden, and currently pending, are to be withdrawn immediately.** This does not, however, prevent any warden from presenting information which is not part of an ongoing Bureau investigation to an agent for any society or association for the prevention of cruelty to animals, or to any police officer, to be used as part of a cruelty investigation. Wardens are also permitted to testify on behalf of such an agent or police officer in a cruelty action brought by that agent or police officer.

Because of the very serious nature of this policy, all Wardens are instructed to sign the attached acknowledgment form, stating that they have read and understand the conditions of [this policy].

\* \* \*

Failure to comply with this policy may result in appropriate disciplinary action.

(Doc. 26, Ex. G at 2-3 (emphasis in original)).

Miller subsequently withdrew all of the animal cruelty charges filed against Holloway. (Doc. 36, Ex. J at 5-6.)  In January 2004, he refiled twenty-six (26) charges against Holloway for violations of the Dog Law and various regulations promulgated thereunder.  Id.

7

3.      Miller's Purported Violation of the Bureau's Press Policy

On November 21, 2003, Bender circulated a memorandum from the Secretary of Agriculture to all state dog wardens directing them to refer all media inquiries to the Department's Press Office.  (S.F. ¶ 39.)  Within several weeks of his receipt of this memorandum, Miller responded to an inquiry from the Bedford Gazette concerning the charges against Holloway.  (See Doc. 26, Ex. I.)  Thereafter, Miller was quoted in an article that ran in the Bedford Gazette on January 6, 2004. Id.; (S.F. ¶ 49.)

Miller did not have prior authorization from the Department's Press Office to speak with the Bedford newspaper, nor did he notify the Press Office regarding this communication with the media.  (S.F. ¶ 53.)  He contends that he was not burdened with these restrictions because he did not initiate the communication.  (Doc. 31 ¶ 53.)  Miller asserts that the Secretary's November 21st directive is devoid of any requirement that employees notify the Press Office after responding to media contacts.  Id.  Miller posits that the Secretary's memorandum was intended to address only employee-initiated media communications.  Id.

On the same day the article ran in the Bedford Gazette, the Bureau conducted an administrative hearing on the decision to deny Holloway a kennel license.  (S.F. ¶ 52.)  The Bureau asserts that Miller's unauthorized communications with the media imperiled its on-going investigation of Holloway and the related

8

administrative proceedings.  (Doc. 24 ¶ 43.)[6]  Miller was subsequently disciplined for

unauthorized communication with the press about a pending investigation.  (S.F.

¶¶ 58, 60.)

      4.    <u>Miller's Kennel Inspection Duties</u>

Miller is the state dog warden assigned to Bedford and Fulton counties.  (S.F.

¶ 28.)  One of his principal duties is to conduct inspections of all licensed kennels

within Bedford and Fulton Counties.  (S.F. ¶ 25.)  In December 2003, while

preparing her annual report, Bender became aware that Miller had not completed

the majority of his kennel inspections for 2003.  (S.F. ¶ 27.)  Although the parties

dispute the number of required inspections for Bedford County and those actually

completed by Miller (<u>compare</u> Doc. 24 ¶¶ 29-32, <u>with</u> Doc. 31 ¶¶ 29-32), it is

undisputed that Miller failed to inspect at least eight licensed kennels in Bedford

County during calendar year 2003.  (Doc. 24 ¶¶ 30-32; Doc. 31 ¶¶ 30-32.)  In addition,

the parties agree that Miller failed to inspect five of the six licensed kennels in

Fulton County in 2003.  (S.F. ¶¶ 33-35.)

When Bender inquired about Miller's failure to complete these inspections,

Miller stated that he "didn't get to them yet" as the result of a heavy workload,

which included the training of two new dog wardens.  (S.F. ¶ 36.)  Bureau statistics

---

[6]It is undisputed that the administrative adjudication of the denial of
Holloway's kennel license was the Department's maiden voyage into the waters of
kennel licensing appeals.  (S.F. ¶ 55.)  This fact clearly heightened the Department's
scrutiny of matters pertaining to Holloway's operations, including Miller's
enforcement actions and media communications.  (<u>See also</u> S.F. ¶ 56.)

for 2003 reflect that required inspections were not completed in nine counties,

including Bedford and Fulton Counties; however, Miller's region represented the

greatest deficiency in kennel inspections, both numerically and as a percentage of

required inspections.  (S.F. ¶ 37; Doc. 36, Ex. Y.)

       5.   <u>Miller's One-Day Suspension</u>

Based upon the information gathered at a pre-disciplinary conference, Miller

was suspended from his position for one-day without pay based upon:  (1) his failure

to complete the required kennel inspections for calendar year 2003, and (2) his

unauthorized communications to the press regarding an ongoing investigation.

(S.F. ¶ 58.)  Miller subsequently filed a grievance, claiming that he had been

disciplined without just cause.  (S.F. ¶ 59.)  In May 2004, the Department and Miller

settled Miller's grievance.  The parties agreed to a one-day suspension without pay

with the understanding that the suspension would have no further effect on Miller's

employment with the Bureau.  (S.F. ¶ 60.)

       6.   <u>Kougher's Exercise of First Amendment Rights</u>

The gravamen of Kougher's First Amendment claim relates to a conversation

between Miller and Burd in which Burd threatened to institute criminal

proceedings against Kougher for interfering with the Bureau's investigation of

Holloway.  Specifically, on October 15, 2003, while traveling together in a pick-up

truck, Burd informed Miller that "Kougher was causing problems by interfering

with [the Bureau's] investigation of the Holloway case and that [he] was considering

filing criminal charges against Kougher."  (S.F. ¶¶ 78, 80.)  Burd did not expect or

10

intend Miller to communicate this threat to Kougher.  (S.F. ¶ 83.)  To the contrary,

Burd directed Miller to refrain from any communications with Kougher about the

Holloway case.  (Doc. 26, Ex. D at 150.)  Despite these instructions, Miller took it

upon himself to advise Kougher to be careful because Burd was contemplating the

filing of criminal charges against her for interference with an ongoing investigation.

(S.F. ¶ 84.)[7]

---

[7]The court notes with interest that paragraph 84 of plaintiffs' Rule 56.1
Statement specifically denies "that Burd indicated he was 'considering' charging
Kougher" with interference.  (Doc. 31 ¶ 84.)  To the contrary, plaintiffs assert that
"Burd directly stated to Plaintiff Miller that he was going to charge her with
interference."  Id.  As record support, plaintiffs cite to pages 148 and 150 of Miller's
deposition.  Id.  The relevant exchange between Plaintiff Miller and *his* counsel on
pages 148 and 150 is set forth below:

> Q:    When Mr. Burd was talking to you in the truck - I'm keying off your
>       testimony - about Chris Kougher, did he indicate why he was going to
>       arrest Ms. Kougher, what he was going to do?  In other words, did he
>       raise something about a criminal investigation?
> A.    He basically stated that she was interfering with his investigation and
>       that he was going to charge - basically, charge her for interference.
> Q.    Okay.
> A.    *She's treading on the line of being charged with interference.*
>                                   * * *
> Q.    Was it your understanding that you should communicate this threat to
>       Chris Kougher?
> A.    I really think that no, he didn't want me to tell her, but I took it upon
>       myself just to advise her that to be careful because, you know, *he was
>       considering it.*

(Doc. 26, Ex. D at 148, 150 (emphasis added)).  Earlier in his deposition, Miller
testified as follows:

> Q.    Then . . . it (referring to statement of Tracy Allen Miller marked as
>       Miller Exhibit No. 13) says:  "Rick Burd then instructed me not to have
>       any further contact with her," which I believe is referring to Christine
>       Kougher, "in that *he (Rick Burd) was considering filing Criminal*

No criminal charges were ever filed against Kougher relative to her actions

involving the Holloway case or the Bureau.  (S.F. ¶ 85.)  Moreover, the record is

replete with evidence that Kougher enjoyed unfettered exercise of her First

Amendment rights both before and after Burd's threat.  (<u>See generally</u> S.F. ¶¶ 86-

110.)  She communicated on multiple occasions with Governor Rendell, various

state senators, the state Secretary of Agriculture, the U.S. Department of

---

> *Charges against her* for interference.  This conversation occurred on
> Rt. 96 south of Fishertown close to the town of [Ryot] . . . on the way to
> Angela Holloways."  Can you just tell me about that?
>
> A.   The discussion.
> Q.   Sure.  Yes.
> A.   Basically, it's outlined there . . . [a]nd he had asked me if I had talked
> to Christine Kougher, which at that time I had.  She had called me a
> couple of times about the dogs, like I said, about the Holloway case.
> And then he elaborated on it, you know, she was causing some
> problems by interfering with their investigation and *he was considering
> filing criminal charges* against her for that.

<u>Id.</u> at 111-12  (emphasis added).

Despite the clarity of this testimony, Miller asserts in his affidavit presented
in opposition to the motion for summary judgment that Burd stated to him during a
September 2003 telephone conference that "he was going to have Chris Kougher of
Keystone Golden Retriever Rescue arrested for interfering with his investigation."
(Doc. 36, Ex. J at 5.)  The affidavit is devoid of any reference to the October 15, 2003
conversation between Miller and Burd in a pick-up truck which Miller described
during his deposition.  Miller's affidavit is precisely the type of post-deposition
remembrance that taxes judicial resources in the disposition of motions for
summary judgment.  The court will not accept contradictory sworn testimony from
the same party which is designed to create a sham fact issue.  <u>Cleveland v. Policy
Mgmt. Sys. Corp.</u>, 526 U.S. 795, 806-07 (1999); <u>Bausman v. Interstate Brands Corp.</u>,
50 F. Supp. 2d 1028, 1031 (D. Kan. 1999) (conflicting affidavit may be disregarded if
court determines it was merely an attempt to create "sham fact issue"), <u>aff'd in part,
rev'd in part</u>, 252 F.3d 1111 (10th Cir. 2001); Steven Baicker-McKee et al.,
<u>Federal Civil Rules Handbook</u> 926 (2006 ).

Agriculture, and Miller about Holloway's unsanitary and illegal operations and the Bureau's failure to stop it. Id. In addition, Kougher communicated to various interest groups via telephone, correspondence, e-mail, and newspaper articles about the Bureau and its lack of enforcement of the Dog Law. (S.F. ¶ 94.; see also Doc. 26, Ex. E-4.)) Rescue also engages in letter writing campaigns and publishes a newsletter to promote the humane treatment of dogs. (S.F. ¶¶ 102, 104-108.) The organization convenes monthly meetings, publishes a newsletter, and maintains a website at www.kgrrescue.com. (S.F. ¶¶ 97, 104, 106, 110.)

### C. Procedural History

In September 2005, the State Defendants filed a motion for summary judgment. After the State Defendants' motion had been fully briefed, the United States Supreme Court issued its decision in Garcetti v. Ceballos, 126 S. Ct. 1951 (May 30, 2006) - a decision addressing a public employee's First Amendment right to freedom of speech. By order of June 20, 2006, the court directed the parties to file supplemental memoranda on the application of Garcetti to the instant matter. The parties filed supplemental memoranda in June and July of 2006 and, hence, this matter is ripe for disposition.

## II. Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). It places the burden on the non-moving party to come forth with "affirmative evidence,

13

beyond the allegations of the pleadings," in support of its right to relief. Pappas v.

City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see

also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (holding that summary

judgment is warranted when the non-movant has no evidentiary support of an

essential element on which it bears the burden of proof).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   **Discussion**

Section 1983 of Title 42 of the United States Code provides private citizens

with a means to redress violations of federal law committed by state actors.  See

42 U.S.C. § 1982.  The statute provides, in relevant part, as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress. . . .

Id.  Section 1983 is not a source of substantive rights, but merely a method for

vindicating violations of federal law.  Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85

(2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a claim

under this section, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Plaintiffs' complaint includes two distinct § 1983 claims:  (1) retaliation leveled against private citizens, Kougher and Rescue, in violation of the First Amendment, and (2) retaliation leveled against a public employee, Miller, in violation of the First Amendment.  The court will address each claim separately.

> A.    First Amendment Claims of Kougher and Rescue[8]

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I.  It is well-settled that, as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for exercising the freedom of expression.  Hartman v. Moore, 126 S. Ct. 1695, 1701 (2006); Perry v. Sindermann, 408 U.S. 593, 597 (1972).  However, the mere act of conducting an investigation with a view toward promoting a prosecution has not

_____

[8]The court acknowledges but rejects defendants' argument that Rescue lacks standing.  (See Doc. 32 at 13-15.)  Candidly, it is a close issue and the court's analysis is hindered by the amorphous nature of the relief requested.  (See, e.g., Doc. 32 at 16 ("[T]he foregoing issues clearly demonstrate that . . . Rescue has standing to pursue claims for the injuries that the organization itself has suffered, and continues to suffer—*whether through an award of money damages or through appropriate injunctive relief*.") (emphasis added)).  See generally Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278 (3d Cir. 2002), cert. denied, 537 U.S. 881 (2002).

been recognized as a constitutional tort.  <u>Hartman</u>, 126 S. Ct. at 1705 n.9.  In

addition, a § 1983 plaintiff must show a causal connection between a defendant's

retaliatory animus and the plaintiff's subsequent injury.  <u>Id.</u>

    In the instant matter, both the *allegata* and the *probata* fall short of the mark.

Indeed, the only claim of retaliation which is not  *de minimus* involves Burd's

alleged threat to prosecute Kougher for interfering with the state's investigation of

Holloway.[9]  On this subject, several facts deserve emphasis.  First, Burd

communicated this purported threat to Miller, not Kougher.  Second, Burd merely

stated that he was *considering* criminal charges against Kougher.  <u>See</u> note 7 <u>supra</u>.

He did not definitively state that charges would be filed.  <u>Id.</u>  Third, Miller

acknowledges that Burd did not intend to use him as a conduit of this information.

Indeed, Burd specifically instructed Miller to refrain from further communications

with Kougher.[10]  Fourth, Kougher was never charged with any violation of the law

_____

[9]To be sure, the court has examined each of the claims of retaliation brought
by Kougher and Rescue.  The remaining claims may be generally characterized as
either (1) *de minimis* (<u>e.g.</u> Doc. 32 at 13 (Rescue was temporarily denied kennel
tags)) or (2) too vague to support a First Amendment violation (<u>e.g.</u> Doc. 32 at 15
("[T]here is considerable evidence that . . . Rescue was given misinformation and
subjected to misdirection throughout its efforts to address the puppy mill problem
in general and the Holloway situation . . . .")).  Hence, the court finds that these
remaining claims are insufficient both in isolation and in gross to be actionable
under the First Amendment.

[10](<u>Compare</u> Doc. 1 ¶ 17 ("[T]he defendants even threatened the plaintiff
Kougher with arrest for interfering with their so-called 'investigation' telling Miller,
with the intention to have him communicate the threats to Kougher in an effort to
shut her up and discourage 'Rescue' . . . ."), <u>with</u> S.F. ¶ 83 ("Burd did not direct
plaintiff Miller to communicate a threat to plaintiff Kougher."), <u>and</u> Miller's
deposition testimony at Doc. 26, Ex. D at 150   ("Q.  Was it your understanding that

relative to her actions involving the Bureau or the proceedings against defendant

Holloway. (S.F. ¶ 85.) Under the circumstances, the court finds that, as a matter of

law, Burd's conduct[11] does not rise to the level of actionable retaliation. In the

absence of any retaliatory conduct, plaintiffs' claims must fail.[12]

Also fatal to plaintiffs' claim is the requirement that a § 1983 plaintiff

demonstrate that the defendant's actions adversely affected the exercise of the

plaintiff's First Amendment rights. Brennan v. Norton, 350 F.3d 399, 419 (3d Cir.

2003); Suarez Corp. Industries v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000) (stating a

§ 1983 "retaliation plaintiff must demonstrate that the defendant's actions had some

adverse impact on the exercise of the plaintiff's constitutional rights."). In the

---

you should communicate this threat to Chris Kougher? A. I really think that no, he
didn't want me to tell her, but I took it upon myself just to advise her . . . .")).

[11]The court notes that the State Defendants dispute plaintiffs' contention that
Burd made any threat of criminal prosecution. (Doc. 25 at 26 n.4.)

[12]In their opposition brief, plaintiffs observe, for the first time, that Kougher
was subjected to other, post-complaint retaliatory actions in addition to the threat of
criminal proceedings. For example, someone from the Bureau is alleged to have
reacted to the application of Kougher's son for the position of dog warden of
Clearfield County as follows: "[N]o one with that last name will ever get a job with
the Bureau." (Doc. 36, Ex. I at 12.) The individual who overheard this comment is
not identified and there is no corroborative evidence. More importantly, these post-
complaint issues are waived because they were not raised in the context of an
amended complaint. Krouse v. Amer. Sterilizer Co., 126 F.3d 494, 499 (3d Cir. 1997);
Protocol Electronics, Inc. V. Transolutions, Inc., No. Civ. 03-4162, 2005 WL 1106132,
at *5 (D.N.J. Apr. 29, 2005) ("[It] is impermissible, without leave of court, to raise
new claims for the first time on summary judgment."). Even in the absence of
waiver, the evidence of these retaliatory acts, based on rumor and innuendo, fails to
provide adequate support for plaintiffs' claims in the context of Federal Rule of
Civil Procedure 56.

instant case, Kougher and Rescue are unable to demonstrate any injury to their respective First Amendment rights.  Over a span of several years, plaintiffs Kougher and Rescue have communicated their dissatisfaction with the Bureau and the State Defendants to numerous government officials through a variety of media. (See generally S.F. 73-110.)  They have written letters, sent e-mails, published newsletters, maintained a website, held meetings, and participated in a "puppy mill awareness" event.  Id.  There is no evidence of record that the State Defendants interfered with any aspect of these activities or infringed upon any other endeavors in violation of the First Amendment.  (S.F. ¶¶ 96-99, 105, 107,109-110.)[13]

As set forth above, the record fails to demonstrate a triable issue of fact on either retaliation or injury.  Plaintiffs have failed to produce sufficient evidentiary support for these essential elements and, accordingly, summary judgment is

_____

[13]Plaintiffs' counsel cites to only one case - Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000) - in support of Kougher and Rescue's First Amendment retaliation claims.  According to plaintiffs' counsel, "the only issue is whether the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights."  (Doc. 32 at 23 (citing Suppan, 203 F.3d at 228)).  However, the Suppan court also recognized:

> The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights, it need not be great in order to be actionable.  Yet even in the field of constitutional torts de minimis non curat lex.  Section 1983 is a tort statute.  A tort statute to be actionable requires injury.  It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . .

Suppan, 203 F.3d at 235 (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982).

warranted in favor of the State Defendants and against plaintiffs Kougher and
Rescue.

### B.   Miller's First Amendment Claims

The Supreme Court has consistently held that public employees do not
abandon their First Amendment protections at the entrance door of their public
employer.  See, e.g., United States v. Nat'l Treasury Employees Union, 513 U.S. 454,
466 (1995); Rankin v. McPherson, 483 U.S. 378, 383-84 (1987); Pickering v. Bd. of
Educ., 391 U.S. 563, 568 (1968).  Most recently, the Supreme Court stated that the
First Amendment "protects a public employee's right, in certain circumstances, to
speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 126
S. Ct. 1951, 1957 (2006).

To state a *prima facie* claim of retaliation, a public employee must prove that:
(1) he engaged in an activity protected by the First Amendment, (2) the defendants'
acts were retaliatory, and (3) the protected activity was a "substantial motivating
factor" of the alleged retaliation.  Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d
Cir. 2006); Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).  If a plaintiff
establishes these elements, a public employer may defeat liability by demonstrating
that it would have taken the same adverse employment action in the absence of the
protected activity.  Hill, 455 F.3d at 241 n.23 (citing Mount Healthy City Sch. Dist.
Bd. Of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); Chambers v. Pennsylvania, Civ. A.
No. 1:04-CV-0714, 2006 WL 3831377, at *7 (M.D. Pa. Dec. 28, 2006); Deluzio v.
Monroe County, No. 3:CV-00-1220, 2006 WL 3098033, at *4 (M.D. Pa. Oct. 30, 2006).

19

Whether an activity is protected is a question of law reserved for the court.  Hill, 455

F.3d at 241 (citing Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004).

The Third Circuit recently restated the parameters of the First Amendment

protection enjoyed by a public employee as follows:

> A public employee's statement is protected activity when
> (1) in making it, the employee spoke as a citizen, (2) the
> statement involved a matter of public concern, and (3) the
> government employer did not have "an adequate
> justification for treating the employee differently than any
> other member of the general public" as a result of the
> statement he made.  Garcetti v. Ceballos, ____ U.S. ____,
> _____, 126 S. Ct. 1951, 1958 (2006).  A public employee
> does not speak "as a citizen" when he makes a statement
> "pursuant to [his] official duties."  Id. at 1960.  "Whether
> an employees speech addresses a matter of public
> concern must be determined by the content, form and
> context of the given statement, as revealed by the whole
> record."  Rankin v. McPherson, 483 U.S. 378, 384 (1987)
> (quoting Connick v. Myers, 461 U.S. 138, 147-148 (1983)).

Hill, 455 F.3d at 241-42.

In Garcetti, the Court held that "when public employees make statements

pursuant to their official duties, the employees are not speaking as citizens for First

Amendment purposes, and the Constitution does not insulate their communications

from employer discipline."  126 S. Ct. at 1960.  There, the public employee

(Ceballos) was a deputy district attorney who exercised supervisory control over

other attorneys and was responsible for the proper disposition of criminal cases

pending on the court calendar.  Ceballos received a complaint from a defense

attorney regarding inaccuracies in a probable cause affidavit used to secure a

search warrant in a pending criminal case.  Id. at 1955.  Ceballos conducted an

investigation and prepared a memorandum to his supervisors which was highly
critical of certain law enforcement personnel.  In the memorandum Ceballos
recommended dismissal of the case.  Despite Ceballos' recommendation, the
prosecution proceeded.  Shortly thereafter, Ceballos was transferred to another
courthouse and reassigned to another position.

Ceballos initiated a § 1983 action claiming, *inter alia*, that his supervisors
violated his constitutional rights by retaliating against him for the First Amendment
expressions contained in his memorandum.  The Supreme Court upheld the trial
court's grant of summary judgment in favor of the public employer, emphasizing
that Ceballos wrote his memorandum "because that is part of what he, as a
calendar deputy, was employed to do."  Id. at 1960.  The court found that
"[g]overnment employers, like private employers, need a significant degree of
control over their employees' words and actions[,]" and therefore, "the First
Amendment does not prohibit managerial discipline based on an employee's
expressions made pursuant to official responsibilities."  Id. at 1958, 1961.  The court
summed up its rationale as follows:

> Restricting speech that owes its existence to a public
> employee's professional responsibilities does not infringe
> any liberties the employee might have enjoyed as a
> private citizen.  It simply reflects the exercise of employer
> control over what the employer itself has commissioned
> or created.

Id.  In the instant case, Miller's claims fail because his expressions fall clearly within
the scope of his professional duties as a state dog warden.

21

As a threshold matter, the court notes that the complaint alleges that retaliatory action was taken against Miller "in an attempt to deter him from *enforcing the laws*" (see Doc. 1 ¶ 11 (emphasis added)), and "because he has *enforced the law* in a fair and even manner" (Doc. 1 ¶ 14 (emphasis added); see also Doc. 1 ¶ 16 ("[B]ecause Tracy Miller sought to *enforce the law* . . . he was punished and intimidated by the defendants who took away his pay [and] interfered with his right to *enforce the law*.") (emphasis added)).  These allegations plainly demonstrate that Miller's claims arise out of perceived interference with his law enforcement duties and responsibilities.

Miller specifically challenges the State Defendants' responses to his filing of animal cruelty charges against Holloway and his communications with a local newspaper.[14]  As a result of the Supreme Court's decision in Garcetti these challenges must fail.  The Garcetti Court sought to avoid "judicial oversight of communications between and among government employees and their superiors in the course of official business" and "displacement of managerial discretion by judicial supervision." 126 S. Ct. at 1961.  When Miller filed charges against

---

[14]Although there is no mention of it in their complaint, plaintiffs' opposition brief states, without record citations, that Miller was "denied an equal opportunity at promotion" in retaliation for his communications with the media.  (Doc. 32 ¶ 7.) In the absence of support in the record, the court deems this claim to be abandoned and will not address it further.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (placing the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings" in support of its right to relief); see also D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999) (noting that abandonment of a position is tantamount to waiver).

Holloway and communicated with the news media, his actions were attributable to the Bureau.  The Bureau has an obvious interest in controlling such conduct.

In both of the challenged circumstances, Miller acted in the same manner as Ceballos in Garcetti, to wit:  pursuant to the duties of public employment, not as a private citizen.  He initiated animal cruelty charges against Holloway in his capacity as a state dog warden.  Like Ceballos' preparation of the memorandum in Garcetti, there is simply no question that Miller's filing of criminal charges against an unlicensed kennel owner was in furtherance of his official duties.  Accordingly, these actions are not protected by the First Amendment.

Similarly, Miller's violation of the Bureau's press policy is not protected by the First Amendment.  The Bureau's press policy required that state dog wardens receive prior authorization before communicating with the media.  Miller was not disciplined for the content of his speech, but for failing to secure this prior authorization.  Regardless of the merits of the policy, Miller's action in responding to media inquiries about a pending matter falls squarely within the scope of his employment.  To be precise, the court finds that Miller's contact with the media addressed matters related to his state dog warden duties.  Because Miller did not speak as a private citizen when he made statements to the media concerning the Holloway investigation, his conduct is not protected by the First Amendment.

The court notes that this result is consistent with at least one other lower federal court following in the wake of Garcetti.  In Price v. McLeish, Civ. A. Nos. 04-956, 04-1207, 2006 WL 2346430 (D. Del. Aug. 14, 2006), plaintiffs were employed as

23

Delaware state troopers assigned to an indoor shooting range.  Apparently

concerned by health risks posed by the range's ventilation system, the troopers

reported their concerns through the required chain of command.  The plaintiffs also

provided statements to the state auditor in connection with an investigation of the

facility.  The plaintiffs alleged that their employer engaged in retaliation following

these events.  The court concluded that plaintiffs had acted pursuant to their official

duties, rather than as private citizens.  The court held that the decision rested on

issues similar to political patronage cases focusing on whether an employee is a

"policymaker."  The court concluded that the scope of an employee's official duties

can be determined by evaluating the expectations of the employee's supervisors,

other employees in the same position, and the employee himself or herself.  Id. at *6

(citing Wetzel v. Tucker, 139 F.3d 380, 383-84 (3d Cir. 1998)).  Finding that none of

the plaintiffs' speech fell outside the scope of official duties, the court entered

judgment against the plaintiffs.[15]

For these reasons, the Court concludes that the activities upon which Miller

bases his claims do not enjoy First Amendment protection.  The court would be

remiss if it did not observe that public employees like Miller have other avenues in

---

[15]Post-Garcetti decisional law from other circuits follows a similar logic,
concentrating on the nature of the plaintiff's employment duties and
responsibilities.  See Green v. Bd. of County Comm'rs, No. 05-6297, 2007 WL 4210
(10th Cir. Jan. 2, 2007); Battle v. Bd. of Regents, 468 F.3d 755 (11th Cir. 2006) (per
curium); Mills v. City of Evansville, 452 F.3d 646 (7th Cir. 2006).

24

which to pursue alleged improprieties in public employment.  As the court opined

in <u>Battle</u> <u>supra</u>:

> Although the Court acknowledged that "[e]xposing
> governmental inefficiency and misconduct is a matter of
> considerable significance," the court concluded the public
> interest was protected by other means, including a
> "powerful network of legislative enactments—such as
> whistle-blower protection laws and labor code"—not by
> permitting First Amendment retaliation claims based on
> "expressions employees make pursuant to their
> professional duties."

468 F.3d at 761 (quoting <u>Garcetti</u>, 126 S. Ct. at 1962).

C.     Claims Against Defendant Holloway

In light of the foregoing analysis, the court deems it appropriate to address

*sua sponte* the only remaining claims—those pending against the *pro se* defendant,

Angie Holloway.  At the outset of this discussion, the court notes that there is no

record evidence to support the proposition that Holloway is a state actor.  State

action is a prerequisite to liability under § 1983.  <u>Lugar v. Edmondson Oil Co.</u>, 457

U.S. 922, 937 (1982) ("[T]he deprivation must be caused by the exercise of some

right or privilege created by the State . . . or by a person who may fairly be said to

be a state actor.").  The absence of state action is fatal to plaintiff's § 1983 claims

against Holloway.

Moreover, plaintiffs' claims against Holloway suffer from the same

conceptual infirmities that afflicted their claims against the State Defendants.

Given these circumstances, it is wholly appropriate for the court to enter judgment

in favor of defendant Holloway.  The court finds that plaintiffs have had adequate

notice and airing of their evidence on all claims, including the claims against

Holloway, in a manner consistent with Third Circuit precedent for the entry of

summary judgment in favor of a non-moving party.  See Coudin v. Duffy, 446 F.3d

483, 500 (3d Cir. 2006); Gibson v. Mayor and Council of Wilmington, 355 F.3d 215,

222 (3d Cir. 2004); Chambers Dev. Co. v. Passaic County Utilities Auth., 62 F.3d 582,

584 n.5 (3d Cir. 1995).

**IV.**    **Conclusion**

For the foregoing reasons the court will grant judgment in favor of all

defendants, and this case will be closed.

An appropriate order will issue.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:        January 25, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTINE KOUGHER,** | : | **CIVIL ACTION NO. 1:04-CV-2209** |
| **TRACY MILLER, KEYSTONE** | : | |
| **GOLDEN RETRIEVER RESCUE,** | : | **(Judge Conner)** |
| **INC.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **RICK BURD, MARY BENDER,** | : | |
| **NATHAN MYER and ANGIE H.** | : | |
| **HOLLOWAY,** | : | |
| | : | |
| **Defendants** | : | |

**O R D E R**

AND NOW, this 25th day of January, 2007, upon consideration of the motion

for summary judgment (Doc. 23), and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that:

1.   The motion for summary judgment filed by defendants Rick Burd,
     Mary Bender and Nathan Myer (Doc. 23) is GRANTED.

2.   Summary judgment is also GRANTED *sua sponte* in favor of defendant
     Angie Holloway.

3.   The Clerk of Court is directed to enter JUDGMENT against plaintiffs
     in favor of all defendants.

4.   The Clerk of Court is directed to CLOSE this case.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge